Your Honors, the Bankruptcy Court dismissed the trustee's complaint with prejudice and the District Court affirmed for two reasons. First, the trustee lacked standing. Second, the trustee failed to state a claim. With the Court's permission, I would like to address the standing issue first. I didn't think the District Courts decided it. I thought the Court assumed it in your favor and yet everybody wants us to decide it. Why do we have to? Well if they assumed it or decided it in my favor or assumed it in my favor, that's great. But I believe that they did hold that we did not have standing and in the alternative, that we failed to state a claim. I can deal with the standing issue, I think, pretty quickly and if I might, I will start there and then spend the rest of my time on the failure to state a claim issue. The trustee has standing here because he stands in the shoes of not just some but of any unsecured actual creditor who could have brought the same claim at the time of the bankruptcy filing. The claim here is for fraudulent transfer under a particular but commonly used section of the Uniform Fraudulent Transfer Act that's codified in Minnesota statutes at 513.44. Correct me if I'm wrong because this is a sort of complicated case. The debts were initially incurred by, can we call it maybe old pedders? Yes. And you are trustee, as I understand it, for the Polaroid entities and perhaps the spun off new pedders. Do I have that right? The fraudulent transfers were made by a company named Pedders Consumer Brands. That company was dissolved on April 27, 2005 and literally one minute later, literally one minute later, that company was reborn like the phoenix, reborn from its own ashes as Pedders Consumer Brands. Same name, same owner, same officers, personnel, customers, line of business and importantly same assets and the same debts were all assumed. So under principles of equity, those two companies can be deemed one and the same company so that the transfer of property by one company can be deemed the transfer of property by the other company if the principles of the law require it. And here, as we've argued in our briefs... Wasn't the debts of the original one, if you don't mind I'll call it old pedders, weren't those extinguished at the time though? They were not extinguished at the time that old pedders dissolved. They remained and they were assumed by new pedders and ultimately paid off by new pedders. And I think what you're getting at is can subsequent creditors of the new pedders who were never owed any money by the old pedders, can they bring this fraudulent transfer claim? And the answer is yes. The answer is yes because under the express provisions of the Uniform Fraudulent Transfer Act section that we're using here, 513.44 in Minnesota statutes, the creditors who are allowed to bring the claim expressly include creditors whose claims did not arise until after the fraudulent transfer. So these subsequent creditors can bring the claim. And here they can do so if the purposes of the law require it. And the purposes of the law do require it here. The reason is that if this wholly artificial separation between old pedders and new pedders is allowed to stand, there will just be a recipe for fraudulent transferors and their transferees to evade the fraudulent transfer laws and do what Tom Pedders did here. The Uniform Fraudulent Transfer Act itself says that does not need to happen. The principles of equity apply and the court can grant whatever relief is necessary under the circumstances. And I remind the court what it already knows. Treating two companies as one and the same is a form of relief. Now one error of the district court, I believe, was to rely on a case from the Southern District of Texas called Asarco. In Asarco, the court held that, sorry I was looking at the clock here. In Asarco, the court held that the owner only creditors who could bring the claims are those creditors who existed not only at the time of the bankruptcy filing but also existed back at the fraudulent transfer. That's wrong. That's contrary to Section 513.44 of the Fraudulent Transfer Act and it's therefore contrary to the Bankruptcy Code, Section 544B. Asarco did rely on two treatises for that statement but those treatises cited cases that don't support that rule. The cases cited in Asarco involved a different section of the fraudulent transfer laws, a section that does require the creditor to have had his claim at the time of the fraudulent transfer. But that's not the section we're relying on here. And the other cases that those treatises relied on borrowed inappropriately from the rule from that first set of cases and applied it to the section that we're dealing with here. But it didn't matter in those cases because there were these pre-existing creditors in all of those cases so the trustee was not denied standing. So your honors, this court is certain to be the last word on this issue of standing, assuming that it is indeed before the court. It's important that the Asarco statement that was accepted by the district court here be rejected because it is clearly contrary to Section 513.44 of Minnesota Statutes and Section 544B of the Bankruptcy Code. If I may then, your honors, I'd like to move on to the issue of does the trustee state a claim for fraudulent transfer? The trustee states a claim of intentional fraudulent transfer because he alleges, number one, that the debtor, Pedder's Consumer Brands, intentionally defrauded its own creditors, and number two, used these fraudulent transfers as the mechanism to do that defrauding. The fraud on its own creditors was that Pedder's Consumer Brands entered into business transactions to purchase goods and services from the creditors who the trustee here represents but never intended to pay for them. That, of course, is fraud. Pedder's Consumer Brands was always insolvent. It lost money on virtually every single transaction it ever did. The only way that it was able to stay in business was through infusions of money from Pedder's Ponzi scheme and through loans from outside lenders. Always insolvent? Are you just using sort of a common sense definition? I'm using the definition that's in the Uniform Fraudulent Transfer Act, and here's the facts that support... But a start-up business can lose money on every transaction for years and be propped up only by its financiers. Here's why it's insolvent, Your Honor. When Pedder's Consumer Brands was capitalized, the money that capitalized it was from the Ponzi scheme. Are you talking the equity, or are you talking the lenders here that you're after? I'm starting with the equity. I'm starting with the initial capitalization... Which is often a phantom. I mean, the equity of start-up companies is more often than not spooky. Here it was definitely spooky because... Yeah, you say after a fact it was all equity from a Ponzi scheme, but that's after the working at it. That's hindsight. It doesn't matter whether it's hindsight in my view. It sure does. If it was capitalized as it was, with money from the Ponzi scheme, it owed all that money to the victims of the Ponzi scheme at the moment of capitalization. So its net capitalization then would be zero. And from that point on... I do not accept those assertions. I just don't think that's right. That's what's alleged... Until it's been litigated as a Ponzi scheme, and remedies have been dished out, the fact that your money has been invested or in transactions has been supplied to somebody to use for equity to form a new company, and years later it is determined in litigation, criminal and civil, that the source of the money was tainted, that doesn't mean you can do anything about it. You can go back to square one and call this all Ponzi victimization and so forth. Respectfully, Judge, I have to disagree. The reason I disagree is, for example, if A steals B's money and uses it to capitalize A's business, that money is owed to B right from the moment of the theft. It doesn't matter that it took years to discover it. But A then lends money to B, and that doesn't mean A can come after it under the Fraudulent Transfer Act. It does, but it does have bearing on the issue of insolvency. When C does lend that money, B still owes that money to C. In your example, B is not insolvent because its solvency turns on tainted money. It's still solvent. It starts at a net equity position of zero, and under the allegations in our complaint, the position goes down from there because Pedder's Consumer Brands lost money every year and lost money on virtually every sale it ever made. Are you arguing that when there is a Ponzi scheme and the person who is directing the Ponzi scheme in Minnesota, he receives those funds in constructive trust for the victims, and that by transferring it, if it transfers to a person who is not a good-faith buyer for value, that there is an inappropriate transfer of funds held in constructive trust? Is that your argument? My argument, I think, is essentially that. My argument is that when Pedder's Consumer Brands received this capitalization of Ponzi monies, it held those monies in constructive trust for the victims of the Ponzi scheme because, since Pedder's Consumer Brands was owned by Tom Pedders, the Ponzi schemer himself, Pedder's Consumer Brands is deemed to have knowledge of the unlawful character of the funds that supplied its capitalization. So, that is the argument for why it is plausible to say that, from the beginning, Pedder's Consumer Brands was insolvent and its insolvency only got worse. Now, the theft or the fraud on the victims here by Pedder's Consumer Brands was that Pedder's Consumer Brands intended not to repay those victims when it entered into contracts to buy their goods and services. And the reason is that because Pedder's Consumer Brands was dependent on outside money from the Ponzi scheme and from outside lenders, it was certain, substantially certain, in fact, it was inevitable, that Pedder's Consumer Brands would go out of business and fail when the Ponzi scheme was discovered. That is because that infusion of Ponzi money would obviously dry up at that point and so too would outside lending. And that's not just plausible. That's what Judge Kishel, the bankruptcy judge here, found actually happened. And Tom Pedders was a bad guy, but he was no fool. He knew to a reasonable certainty that that was what was going to happen, that when the Ponzi scheme exploded, the creditors not just of the Ponzi scheme but the creditors of Pedder's Consumer Brands too would be left unpaid. So that means, since he knew that to a reasonable certainty, he intended that consequence. Now, the fraudulent transfers or the transfers here to Opportunity Finance provided the platform for Pedder's Consumer Brands to do this fraud to its unsecured creditors. Pedder's Consumer Brands received over the course of less than three years $248 million from Opportunity Finance. That's what kept Pedder's Consumer Brands alive, kept it in the marketplace, gave it the opportunity to bring in these creditors that Pedder's Consumer Brands knew to a substantial certainty it was not going to repay. The transactions between Pedder's Consumer Brands and Opportunity Finance gave Pedder's the fishing line and baited the hook by which it was able to bring in these creditors. Now, the case that we rely on here is the most important case of all, I think, in fraudulent transfer law in Minnesota, and that is Finn versus Alliance Bank. In Finn, the transfers were repayments of real loans or loan participations, just like the payments here to Opportunity Finance. The Supreme Court, per Justice Strass, held that those transfers stated a claim, or that the receiver, rather, stated a claim that those transfers were actually fraudulent transfers because they made it possible for the fraudster to commit his fraud against the other fraudulent victims. They assisted the fraudster in obtaining other creditors that he knew he was never going to repay, and that is exactly what the trustee alleges here. The trustee also states a claim for constructive fraudulent transfer, which, as this Court knows, has two elements. One of them is insolvency, and I've set forth the facts that I think make it plausible that Pedder's Consumer Brands was insolvent at all times. The second element of constructive fraudulent transfer is lack of reasonably equivalent value. Here you have two sets of payment penalty transfer. $349,000 went to Opportunity Finance on the very day that Pedder's Consumer Brands, the old Pedder's Consumer Brands, dissolved. Pedder's Consumer Brands got nothing in exchange for that transfer, so there was clearly a lack of reasonably equivalent exchange there. The second set of fraudulent transfers here, Pedder's Consumer Brands, it simply gave the old one, and therefore the new one. This $349,000 transfer happened on the last day. There are two sets of transfers here. Okay, I'll save the $348,000. I'll go right to the loans. The loans were made at 12% interest. That's not no value. You asserted no value. No, Your Honor, I do not assert no value. That's value. What I assert is lack of reasonably equivalent value, which is a distinct concept. Okay? I will agree wholly that there was value given by Opportunity Finance. The issue before this Court is was there reasonably equivalent value? The allegation in the complaint is that's not reasonably equivalent value because the market rate for similar loans was substantially less interest. Now Judge Kishel Now the market rate varies by the strength of the borrower. Are you talking, I mean you're not talking prime obviously, but where do you get 12% was off the market? Here's where I get it. Lending rates by 2007 and 2008 were so bad, you know, everybody crashed. Right. These transfers It was not that unusual. These transfers occurred between 2003 and 2005. The reason that the 12% was above market, and we believe it was about 50% above market, is that these loans were secured, and they were accounts receivable from companies that were blue chip companies like Target and Best Buy. So there was little, if any, risk to these loans. I do not think under the case law that we have to allege what the actually lower market rate was. This is a Rule 8 standard of pleading on constructive fraud. But if we do have to make the allegation and if we're not making the opportunity, we can allege in good faith that the correct market value for these loans would have been an interest rate of 8%. In other words, peddlers gave opportunity finance a 50% premium, and that's not reasonably equivalent value. Now for the reasons that I have discussed You're saying it doesn't have to be Rule 9, but it has to be plausible. Has to be plausible, that's right. An allegation that 12% is not reasonably equivalent, a bare allegation to me would not be plausible. We support the allegation with the fact that these loans were secured by these blue chip companies. But again, Your Honor, the case law that we found, all of it, says we don't have to state what the actual rate is. But if we do have to state it Are they pre-Iqbal cases? I believe they are not, but I can't tell you for sure. Because the world changed. I agree. I'd have to look back at the brief. But if we do have to state that, we can if we are given the opportunity to amend, and as I say, we would allege in good faith that the correct rate was 8%. So because we do have standing, because we do state a claim for actual fraudulent transfer and constructive fraudulent transfer, it would not be futile for the trustee to amend his complaint. And the notion that the trustee unreasonably delayed in seeking to amend is just plain silly. To the extent anybody raised these issues at all before Judge Kishel's decision, the first time they were ever raised was at oral argument on the motion to dismiss. And at that very motion, the trustee asked, may we amend, may we at least brief these issues? And Judge Kishel said no, he didn't want us to do that. Two years later, I asked again in case he had changed his mind, and he said no. And I just want to note that by contrast, Judge Kishel allowed a different Petters trustee, Douglas Kelly, in a case against opportunity, to amend his complaint four times. The trustee, therefore, your honors, respectfully asks this court to reverse the judgment of the district court and remand this case to the bankruptcy court. Thank you. Ms. Rushing. May it please the court. The trustee lacks statutory standing to pursue these fraudulent conveyance claims as both the district court and the bankruptcy court correctly held. We've got two of them, two. Yes, your honor. I represent the opportunity finance defendants. I hope to focus on standing and talk about actual intent as well. Why do you have to decide standing? Well, your honor, both the district court and the bankruptcy court found that the trustee lacked statutory standing. I believe your honor might be thinking about the fact that the district court assumed without deciding that the trustee had adequately pledged succession. But the question of succession does not resolve the question of standing here, as the district court found and the bankruptcy court found. We think this court can resolve the appeal based on standing alone. I want to step back and remind the court about the sequence of events because it is confusing. The transfers at issue here were allegedly made by Pedder's CB, Pedder's Consumer Brands, between 2003 and April 2005. In April 2005, Mr. Pedder's purchased Polaroid and Pedder's CB passed out of the picture, allegedly through a merger, according to the new allegations by the trustee. Years later, the debtors here, which are Polaroid entities, PHC and PCE, filed for bankruptcy and the trustee has not been able to identify any creditor of those debtors that he represents who have a claim against Pedder's CB, that is, against the entity that made the transfers. That's why he lacked standing to avoid Pedder's CB's transfers under the bankruptcy code and Minnesota law. The trustee doesn't contest that he has not identified any creditor of Pedder's CB. As the trustee appears to admit, and this court noted at argument, all of Pedder's CB's... They should be treated as a matter of equity, as one. I mean, a successor corporation, in at least some fact situations, sometimes under corporate law, sometimes just as a matter of litigation, equitable principles, can be treated, the old and the new can be treated as one, as a single entity, right? In lots of contexts. Respectfully, Your Honor, I think the trustee has blurred the issue here. Succession doesn't mean that the corporate form is disregarded and two companies are treated as one. The trustee cites cases about alter ego and piercing the corporate veil. Yes, it may, depending on the facts. Respectfully, Your Honor, corporate succession and the doctrines that have to do with corporate succession that have been cited here have to do with whether the successor company is responsible for the liabilities of the predecessor. That's what is resolved by that. Doctrines like alter ego or piercing the corporate veil, which are the cases that the trustee relies on, even though he doesn't argue that those could be satisfied, those doctrines apply here, those are doctrines that have to do with obliterating the corporate form. And the reason that's allowed under those doctrines is because the companies themselves or the persons themselves have commingled and treated it as though these companies aren't separate, they're not independent. Therefore, the law says, well, fine, we'll treat them as one. That's an equitable situation where two companies are treated as one. There's no allegation of that here. What's alleged here is corporate succession where you have very different companies who follow the laws of disillusion and allegedly merger to pass liabilities and assets from one company to another. Just because it can be horizontal, it can't be vertical. That's just dead wrong. Under cases I've had, I've had a tough case this year where the whole thing was to look at all the different ways that a successor can be liable for a predecessor's liabilities despite corporate law to the contrary under Missouri law. And there were two or three different avenues for a plaintiff to get at that. That's certainly the case, Your Honor, that a successor can be responsible. Why can't they be applied here? It's certainly the case that a successor can be liable for a predecessor's liabilities if under the various doctrines he expressly assumes it or what have you. What we're talking about here is whether... Regardless of assumption, in some circumstances, de facto mergers... Yes, Your Honor. That doesn't require an assumption. There are doctrines that would allow for that under Delaware law. Under Minnesota law, express assumption would be required. My point is, that doesn't make the creditors of the successor company creditors of the predecessor. The question here is, could a creditor of one of these Polaroid entities bring an avoidance challenge on its own? Could they bring an avoidance claim against Petters C.B.? The answer is, of course, no. They're not creditors of Petters C.B. They don't have a claim against Petters C.B. The reason that is, is because all of the creditors of Petters C.B. were satisfied. The trustee admits that in his brief, that at the time of this alleged succession, all of the creditors of Petters C.B. were satisfied. That's why this is not only not a legal problem, it's not a policy problem. The reason that there are no creditors in whose shoes the trustee can stand here is because they were all paid. They were all satisfied. None of the creditors of Petters C.B. have been left in the cold. The trustee would like to say all of these corporations can be treated as one. Therefore, the eventual fact that Tom Petters purchased Polaroid and then created PCE, which is one of the debtors here, that's the claim's successor, that somehow all of that means you could look back to the predecessor and say, well, now successors, the creditors of the successor can bring a claim against the predecessor because he would have brought money, that company would have brought money into the relationship. But that leads to absurdity. What about the predecessor's predecessor? That money eventually would have ended up in the successor corporation as well. But it's simply not the law. The creditors of successor corporation become creditors retroactively of every predecessor. And that's what we're talking about here. We're not just talking about whether the debtor, whether PCE or PHC can claim a property interest in Petters C.B.'s property or in their transfers. We're talking about whether a creditor could bring a claim and they can't because no creditor exists with a claim against Petters C.B. That's something that the trustee admits here and it's certainly not plausible based on his pleadings. I would just briefly touch on the fact that the trustee wants to say that this court can, as a matter of equity, create standing for the trustee even when such a creditor doesn't exist. That's clearly not the law. Congress and the Minnesota legislature have carefully delineated who has standing to sue and when they may do that. This court simply does not have the ability to say, as a matter of equity, we're going to create standing even when these statutes don't provide for it. That's not the way that it works. I would point out also that... Standing is a word thrown around that has a lot of meanings. Are you talking Article III standing or statutory standing? This is a question... I'm using the word because it kind of fits. This is clearly a question of statutory standing. The trustee... And what federal statute declares no standing? That's 11 U.S.C. 544B1 and that points you to Minnesota law. That points you to Minnesota Statute 513.44A. Both of those require that you have a creditor with a claim against the transferor who could avoid that transfer. The trustee stands in the shoes of that creditor. Without that creditor, the trustee lacks standing and that's why he lacks standing in this case. To briefly touch on the actual fraud, I would just like to point out that this case is unlike Finn. The trustee wants to say that because the court found that actual fraud was adequately pleaded there, it could be pleaded here. In Finn, it was the actual Ponzi scheme that was the transferor. Here, the trustee is trying to say you can infer intent to defraud because Tom Petters and some other part of his business was running a Ponzi scheme. You're talking so fast. What case says the actual Ponzi scheme? May I continue, Your Honor? I'm out of time. I just want to make sure I can answer your question. Your last point. No, you can't continue beyond that. Certainly. The Finn case. The trustee relies on Finn saying that the court there found that actual intent was adequately pleaded. We think that's distinguishable because there, Finn was the actual Ponzi scheme was the transferor. The court in Finn said because it was a Ponzi scheme, because the defendant had admitted that he intended to defraud, this is all evidence of actual intent. Here, the Ponzi scheme was in a different part of Tom Petters' enterprise and the trustee has alleged that Petters C.B. was actually engaged in real transactions where it made real money and paid back its creditors with that money. There's no, not a plausible. Except for the $349,000 transfer, which they allege was unsupported by anything. As a question of reasonably equivalent value, yes, Your Honor. What I'm saying here is that the amended complaint repeatedly asserts that Petters C.B. Do we really know what the amended complaint would actually say? Because he wasn't allowed to amend the complaint. Pardon, Your Honor. The second amended complaint, the hypothetical third amended complaint that was never proffered in the bankruptcy court apparently could say anything at all. But based on what the bankruptcy court had in front of it and facts that wouldn't contradict that, the trustee has pled that Petters C.B. was a What authority did the bankruptcy court have for just willy-nilly not allowing even a motion to be filed to amend the complaint for a third time? When, I believe counsel didn't move, but counsel said Counsel said they wanted to move, and then the judge said, no, you're not going to be allowed to file your motion, and he directed the clerk not to allow the filing of the motion, right? Yes, because the decision was pending. What authority did the bankruptcy judge have to do that? The bankruptcy judge has authority under Rule 15 to order the proceedings. And because it had been 20 months since argument, and he was about to issue a decision, it was well within his authority to say that he was not going to entertain yet another amendment. So then why didn't Judge Nelson just affirm on that instead of assuming hypothetical facts? I suppose she wanted to give the trustee every benefit of the doubt. And since he introduced new facts in front of the district court, she not only said there was prejudicial delay, and that itself is a perfectly good reason to deny leave to amend. She also found as a separate reason that it would have been. And wouldn't that prejudicial delay exist in every single case? No, Your Honor. What was different about this than just the ordinary delay? Why is it prejudicial? Your Honor, the court cited an example of a case where, again, you're on the eve of a decision. And here, this was the third complaint, I believe. It had been 20 months since the issue that the trustee allegedly wanted to amend with respect to had been brought up at the hearing. And the trustee, right before a decision was about to issue, decided, let's try a new tactic and offer an amendment. And the district court or the bankruptcy court was well within his authority to say, I'm not going to allow that sort of maneuver here. Now, if Pelley's get 15 minutes, how much is left? They don't get 8 and 7. They get 15 combined. Correct. She has gone over by 3 and 1⁄2 off of his 7. So 3 and 1⁄2. There's 3 and 1⁄2 left? All right. Respectfully, Your Honor, the trustee's counsel got well in excess of his time. If we could, we would like a couple more minutes. Thank you. Good morning, Your Honors. Peter Havilis on behalf of DZ Bank. I'd like to make a couple of observations and then jump into the constructive fraud and reasonably equivalent value issues, and then I'll come back to actual fraud at the end, depending on my time. I hope I will go quickly, Your Honor, and I'll address Your Honor's questions. I don't know if I will, but I'll try my best. Your Honor, in his papers, the trustee argues heavily in reliance on what this court did. We're going to talk about reasonably equivalent value and constructive fraud. Yes, Your Honor. It seems to me that there's a passage in Finn that leaves that Alliance Bank introduced evidence at the summary judgment stage, again undisputed, that the rate of return on the loan it purchased was commercially reasonable. Yes. Now, if that was essential for Alliance Bank to prevail, why isn't the 12 percent interest issue alive and well for the trustee? For a few reasons, Your Honor. First, the trustee did plead 12 percent here, as Your Honor noted, and in the mid-2000s. As Judge Kishel stated, other than accompanied by an allegation in the complaint that that wasn't markedly reasonable, there wasn't plausible facts. As Your Honor observed, 12 percent is within the range of reason. The trustee would try to suggest, well, it could be lower, but there's no allegation that the negotiation wasn't arm's length of the interest rate. And to say that 12 percent, when interest rates went as high as the low 20s during that time period, for all kinds of different corporate transactions is not plausible. That's the first reason. The second reason is, Your Honor, we cite two decisions in our brief that come from that same time period. They are the Lustig and Carazzola decisions. One was a bankruptcy case that was affirmed by the district court, and the other was a district court case. In both of them on motions to dismiss on interest rates, one, Lustig, involved 12 percent, Carazzola was 8 to 15 percent. It seems to me if this came up at the last minute, as the trustee's counsel said this morning, I don't know, and that a request to amend on this was basically an Iqbal issue, it should have been entertained. Well, Your Honor, we raised the issue about interest rates and reasonably equivalent value with the argument that occurred in the spring of 2014 when it was argued. The trustee, in his offer to proof that he made in December of 2016, never offered to make any allegations or changed allegations regarding interest rate. So that issue was put out there at the very inception of the motion to dismiss about the reasonableness and the Iqbal issue. But also, as I said in the Carazzola and Lustig case, the district courts in both of those decisions, one by affirmance, said that in uniform fraudulent transfer acts involving claims involving commercial loans, interest rates in the 8 to 15 percent, in one case specifically 12 percent, as a matter of law on a Rule 12b6 motion, created reasonably equivalent value. Your Honor, the courts in the Western District of New York and Carazzola, and I'm forgetting the district right now, in the Lustig case, but both are cited in our Memorandum of Law, Your Honor. And I'll give you the sites to the... You know, that isn't going to do it as a pleading matter. Well, except in both... You're talking summary judgment stuff now. No, in both the decisions I addressed, Your Honor, Lustig... They sound wrong, as you stated. They were a 12b6 assertion that any interest rate of 8 to 15 percent cannot be commercially unreasonable as a matter of law. I'd say poppycock. That was with respect to the interest rates that traded at that time, Your Honor. To be unreasonable, the rates have to be offensive. Remember, these are commercial loans. They're not subject to usury. They weren't even close to the usury rate, even if you argued that they're usurious. And the issue is, if it was 2%, 3%, or 4% higher in a commercial market environment to say that creates a plausible issue of fact about reasonably equivalent value goes too far, Your Honor, because rates are variable. They are subject to all kinds of negotiation. There is no one fixed published rate that applies across the board to everyone. And to say that it's plausible to say that's not a market rate in the environment that existed in the mid-2000s, because we forget, because it's been 10 years since Lehman, what high interest rate environments were like, doesn't pass the Iqbal test. And the fact is, as the district court and, or not the district court, but as the bankruptcy court said, there's no plausibility to say, and it would be futile to say that something at the 12% range would be unreasonable for a commercial loan because it's a matter of risk in negotiation, as Your Honor pointed out. If I may, because we consumed all of this in the interest. All right, thank you, Your Honor. Did Mr. Thompson use his time? He did, Your Honor. Very good. The case is complex. It can't be handled in a short argument time, but you've done a good job of helping us get there. And it's complex. We'll take it under advisement. Thank you, counsel.